In re Roy **LIPPMAN,** Debtor.

**Bankruptcy No. 90B–12230 (HCB).**

United States Bankruptcy Court, S.D. New York.

Dec. 18, 1990.

As Corrected Dec. 19, 1990.

Law Offices of Randy M. Kornfeld, New York City, for Roy Lippman.

Ira M. Bierman, by Ira M. Bierman, Mark S. Friedlander, Great Neck, N.Y., for 340 East 93d Street Corp.

## DECISION AND ORDER

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

340 East 93d Street Corporation ("Movant") seeks an order deeming three proprie-

tary leases between Roy Lippman, as lessee, ("Debtor" or "Lippman") and the Movant, as lessor, rejected pursuant to 11 U.S.C. § 365(d)(4) and vacating the automatic stay of section 362, 11 U.S.C. § 362. In the alternative, the Movant requests an order directing payment of all post-petition maintenance charge arrearages. The Debtor objects to these requests.

## I

The facts and history of this dispute are convoluted and the subject of much dispute. As the following summary of this history demonstrates, a decision to lift the automatic stay is premature at this time. An evidentiary hearing is necessary to determine the amounts owed by Lippman to the Movant, whether the Movant unjustifiably sought to evict Lippman and his subtenants, and whether any non-payment was justified or excused under relevant law by such acts, if proven.

Since the motion to deem the leases rejected as a matter of law pursuant to section 365(d)(4), however, is ripe and would obviate the need for an evidentiary hearing if successful, the Court will bifurcate the Movant's motion and decide that discrete issue at this time.

## A

The Debtor, an individual, currently leases[1] three apartments from the Movant, a New York corporation created for cooperative ownership of an apartment complex. The Debtor leased apartment 14–E on or about April 23, 1987, apartment 23–F on or about June 9, 1987, and apartment 15–H on or about June 20, 1986 (collectively, the "Leases" or "Apartments"). The Debtor and his daughter presently occupy apartment 14–E.[2] *See* Affidavit of Roy Lippman, sworn to October 30, 1990, ¶ 3(10) at 6 (the "First Lippman Aff.").

The Debtor filed a petition for relief from his creditors under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq* (1989), (the "Code") on July 16, 1990. Prior to the petition date, the Movant had commenced a non-payment proceeding in New York State Court regarding apartment 14–E and moved to compel payment of use and occupancy charges for apartment 23–F. The Movant and Debtor have also been parties to several other suits related to these apartments.[3]

The gravamen of the Movant's motion is the Debtor's failure to pay post-petition maintenance charges for the three apartments. The exact amount owing as main-

**1.** The Debtor has not objected to the Movant's characterization of his interest in the Apartments as a leasehold. In his papers, the Debtor has implicitly assumed that the documents created true leasehold interests and has predicated his arguments opposing the motion on that assumption. *Cf. Liona Corp. v. PCH Assocs. (In re PCH Assocs.),* 804 F.2d 193, 198–99, Bankr.L. Rep. (CCH) ¶ 71,517 (2d Cir.1986) (holding section 365(d)(4) inapplicable to sale-leaseback arrangement because not true and bona fide lease). *Accord Baker v. Harris Pine Mills (In re Harris Pine Mills),* 862 F.2d 217, 220–21, 18 Bankr.Ct.Dec. (CRR) 947, Bankr.L.Rep. (CCH) ¶ 72,502 (9th Cir.1988) (logging agreement not true lease for section 365(d)(4) purposes) *City of San Francisco Market Corp. v. Walsh (In re Moreggia & Sons, Inc.),* 852 F.2d 1179, 1184–85, 19 Collier Bankr.Cas.2d (MB) 949, 18 Bankr.Ct. Dec. (CRR) 206, Bankr.L.Rep. (CCH) ¶ 72,417 (9th Cir.1988) (lease agreement for commercial rental space not true lease under section 365(d)(4) where obligation to pay rent tied to repayment of bonds).

**2.** Steven and Cynthia Steinschriber co-own the Apartments with the Debtor, although the Steinschribers do not live in any of the Apartments at

this time. First Lippman Aff. ¶ 3(3) at 2; Affidavit of Roy Lippman, sworn to November 15, 1990 ¶¶ 5, 6 ("Second Lippman Aff."). Currently, no one resides in apartment 15–H. *Id.* at ¶ 3(10) at 6. Apartment 23–F is sublet to Lawrence Douglas. *Id.* at ¶ 3(6) at 4.

**3.** These suits include a state court action to muzzle and leash a German Shepherd residing in apartment 23–F, *see* Brandt Aff. at ¶¶ 9, 10, a summary hold-over proceeding in New York City Housing Court alleging an illegal subletting of apartment 15–H, *see* Brandt Aff. at ¶ 11, a state court action by the Debtor regarding the propriety of the termination of the lease for apartment 15–H, *see* Movant's Memorandum of Law 1, and an action by the Movant for a declaration that the lease for apartment 23–F was duly terminated and seeking eviction of the Debtor therefrom, *id.* In the Debtor's action against the Movant regarding Apartment 15–H, the Debtor sought to enjoin Citibank, N.A., the mortgagee, from foreclosing on the apartment. Lippman Aff. at ¶ 13(b). That request was denied in April 1990. *Id.*

tenance is the subject of much dispute. The Movant contends the Debtor owes the following amounts as post-petition maintenance through September 30, 1990:

A) $2,671.49 for apartment 14–E;

B) $2,758.95 for apartment 15–H; and

C) $2,867.33 for apartment 23–F.[4]

Affidavit of Michael Brandt, sworn to October 9, 1990, ¶ 8. ("Brandt Aff."). The Debtor vigorously disputes these figures. According to Lippman, the amounts due for post-petition maintenance through September 30, 1990 are:

A) $1,899.45 for apartment 14–E;

B) $1,426.13 for apartment 15–H; and

C) $2,002.65 for apartment 23–F.

First Lippman Aff. at ¶ 3(8).[5] Since more than two months have passed since the initial tabulation of maintenance charges, the figures for the amounts owed have increased substantially. The Debtor currently holds Mr. Douglas's rent for apartment 23–F in an escrow account and has not paid the Movant any maintenance charges for that apartment.[6]

## B

From these facts, the Movant argues that the automatic stay should be vacated "for cause" under section 362(d)(1)[7] of the Code because the Debtor (i) is in substantial default under the Leases and (ii) is incapable of providing adequate assurance of post-petition performance. Brandt Aff. at ¶ 11. More specifically, the Movant contends the Debtor's admitted failure to pay any post-petition maintenance, *id.* at ¶ 11(A), and harboring a "dangerous" dog in purported violation of lease restrictions, *id.* at ¶ 11(B), warrants lifting the stay.

The Movant also argues that the Leases have already been rejected by operation of law. Under section 365(d)(4) of the Code, a lease for nonresidential real property is deemed rejected if not assumed or rejected within 60 days after the filing of the petition if no extension is timely sought from the court. *See* 11 U.S.C. § 365(d)(4) (1990). Here, sixty days have clearly passed since July 16, 1990, the petition date, and therefore the Leases, according to the Movant, are rejected automatically.

In response, the Debtor contends that no grounds exist for lifting the automatic stay. Specifically, the Debtor submits the Movant has not produced any evidence "regarding the value of the apartments and whether or not there is equity in them in order to adequately protect the status of the movant."[8] Debtor's Memorandum of Law in Opposition to Motion 3. The Debtor further argues that the Movant's litigations in state court have interfered with his right to rent the apartments, thereby justi-

---

**4.** The Movant also submits that Lippman owes the following sums for unpaid pre-petition maintenance charges:

A) $2,769.59 for apartment 14–E;

B) $12,589.14 for apartment 15–H; and

C) $17,596.16 for apartment 23–F.

Brandt Aff. at ¶ 8.

The Debtor disputes with these figures. He submits that the pre-petition maintenance charges currently owing are:

A) $3,349.91 for apartment 14–E;

B) $6,938.49 for apartment 15–H; and

C) $15,061.27 for apartment 23–F.

First Lippman Aff. at ¶ 3(8).

**5.** The Movant also alleges the Debtor owes, as his pro rata share of 1990/1991 real estate taxes on the building, $730.74 for apartment 14–E, $741.00 for apartment 15–H, and $762.66 for apartment 23–F. *See* Brandt Aff. ¶ 8. The Debtor does not contest the tax figures.

**6.** As of August 31, 1990, the escrow account contained $18,948.27, representing pre-petition rent payments by Mr. Douglas. First Lippman Aff. ¶ 3(10) at 6. Since that date, no principal has been added to the escrow account because Mr. Douglas has ceased to make rent payments on the ground that the Movant has served him with a notice of termination of sub-tenancy. *Id.*

**7.** Section 362(d)(1) provides:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

11 U.S.C.A. § 362(d)(1).

**8.** An analysis into the equity of the property would be germane were the Movant a secured creditor. Since both parties treat their relationship as though they are lessor and lessee, the Court will proceed with that as an assumption as well.

fying or excusing his failure to pay maintenance charges. *See id.* at 4–6.

As noted, this opinion concerns only the Movant's contention that the Leases have been rejected as a matter of law pursuant to section 365(d)(4). The other matters require an evidentiary hearing with the exception of the bench order directing payment of some sums due on one of the apartments. With respect to the rejection claim, the Debtor contends that the Apartments are residential and therefore not subject to automatic rejection under section 365(d)(4). The Debtor argues that the Leases are residential because they are "for *residential* apartments located in a *residential* cooperative building in New York City [which] contains over 350 *residential* cooperative apart-ments [sic]." *Id.* at 7 (emphasis in original).

Arguments were heard by the Court on November 21, 1990 and December 5, 1990, on the parties' submissions.

## II

### A

The section in principal contention here, section 365(d)(4), provides:

> Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of *nonresidential real property* under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

11 U.S.C. § 365(d)(4) (1990) (emphasis added).

**9.** Section 365(d)(3) provides in relevant part: The trustee shall timely perform all the obligations of the debtor, ... under any unexpired lease of nonresidential real property, until such lease is assumed or rejected.... 11 U.S.C. § 365(d)(3) (1990).

**10.** Section 365(d)(2) provides: In a case under chapter 9, 11, or 13 of this title, the trustee may assume or reject an

This provision and subsection (d)(3) [9] were added to the Code in 1984 as part of the Bankruptcy Amendments and Federal Judgeship Act, Pub.L. No. 98–353, 98 Stat. 333 (1984), ("BAFJA") to require a debtor to assume or reject a lease of real property within 60 days or show cause why the period should be extended, while further requiring continued performance of the debtor's obligations thereunder until the decision to assume or reject is made.

Until BAFJA, leases of both residential and nonresidential real property were governed by the same provision of the Code, *see* 11 U.S.C. § 365(d)(2) (1983) [10], which did not provide for automatic rejection after 60 days but rather envisioned assumption or rejection at any point prior to confirmation of a plan unless a party to the lease convinced the court to compel assumption or rejection within a certain time. BAFJA carved out an exception to this general rule by enacting amendments to section 365, including the restrictions on leases of nonresidential real property.

In discussing the changes to section 365(d) wrought by BAFJA, Senator Hatch commented:

> The first problem which this bill would remedy is the long-term vacancy or partial operation of space by a bankrupt tenant. Although in a chapter 7 case the bankruptcy code presently requires that the trustee decide whether to assume or reject an unexpired lease within 60 days after the bankruptcy petition is filed, there is no deadline for this decision in a chapter 11 case. Because of the unprecedented number of bankruptcy cases and the consequent delays in the bankruptcy courts, tenant space has been vacated for extended periods of time before the bankruptcy court forced the trustee to decide whether to assume or reject the

executory contract or unexpired lease of the debtor at any time before the confirmation of a plan, but the court, on request of any party to such contract or lease, may order the trustee to determine within a specified period whether to assume or reject such contract or lease.

11 U.S.C. § 365(d)(2) (1983).

lease. During this time, the other tenants of the shopping center are hurt because of the reduced customer traffic in the shopping center. Tenants and landlords in other *nonresidential structures* have encountered similar problems.

The bill would lessen the problems caused by extended vacancies and partial operation of tenant space by requiring that the trustee decide whether to assume or reject a nonresidential real property lease within 60 days after the order for relief....

130 Cong.Rec.S. 8894–95 (daily ed. June 29, 1984) *reprinted in* 1984 U.S.Code Cong. & Admin.News 576, 599 (statement of Sen. Hatch) (emphasis added). Further legislative history is found in a 1983 Senate Committee report discussing the identical provision in previous bills which passed the Senate in 1982 and 1983. Focusing on shopping centers and similar commercial environments, the report pointed to the lack of any deadline for assumption or rejection in cases under chapter 11:

Consequently, an extended period of time often passes before the trustee makes such a decision in a Chapter 11 (reorganization) case. During this dead time, the trustee often does not operate the space, or operates it at a much reduced level, thereby causing substantial economic harm to other tenants in the shopping center.

Senate Committee on the Judiciary, Omnibus Improvements Act of 1983, S.Rep. No. 98–65, 98th Cong., 1st Sess. 36 (1983).

Regarding the crux of the dispute in this case, the meaning of the term "nonresidential real property", the existing judicial authority is split over the relevant test for nonresidentiality. One test focuses on the nature of the property, *i.e.*; whether people reside on it. *See In re Care Givers, Inc.*, 113 B.R. 263, 266 (Bankr.N.D.Tex.1989) (nature of property controls; holding nursing home leases residential); *Department of Army v. Terrace Apartments, Ltd. (In re Terrace Apartments, Ltd.)*, 107 B.R. 382, 383–84 (Bankr.N.D.Ga.1989) (nature of property controls; holding apartment complex leases residential despite fact that

debtor owned it for income production); *In re Emory Properties, Ltd.*, 106 B.R. 318, 320 (Bankr.N.D.Ga.1989) (nature of property controls, holding hotel nonresidential); *In re Independence Village, Inc.*, 52 B.R. 715, 721–22, 13 Collier Bankr.Cas.2d (MB) 476, 13 Bankr.Ct.Dec. (CRR) 637 (Bankr.E.D.Mich.1985) (nature of property controls; holding nursing home leases residential despite fact that debtor did not reside in the property and held it only for commercial purposes). The other test focuses on the nature of the lease, *i.e.*, whether the lease provides income to the debtor. *See Wilson v. Sonora Convalescent Hospital, Inc. (In re Sonora Convalescent Hospital, Inc.)*, 69 B.R. 134, 136 (Bankr.E.D.Cal.1986) (nature of lease controls; holding convalescent home leases nonresidential since debtor derived income from leases and despite fact patients actually resided on property) *In re Condominium Admin.Serv., Inc.*, 55 B.R. 792, 795 (Bankr.M.D.Fla.1985) (nature of lease controls; holding mobile home park leases nonresidential). Since no court in the second circuit has dealt with this issue, the question is essentially one of first impression in this circuit.

B

After reviewing the relevant sections of the Code, the legislative history involved, and the division in the case law, the Court is persuaded that, for purposes of section 365(d)(4), the nature of the property, and not the nature of the lease, governs whether a lease is nonresidential.

The structure and language of section 365 indicate that Congress was concerned with the type of property involved and not the fact that the lease produced money for the debtor. Indeed, in section 365(d)(4) itself the modifier "nonresidential" directly qualifies the term "real property". Purely as a matter of grammatical construction, therefore, "nonresidential" refers to the nature of the property and not the type of lease. Certainly, had Congress intended section 365(d)(4) to apply to all commercial leases it easily could have used that term or modified "lease" with the adjective "nonresidential", but it did not. As a result, the phraseology itself demonstrates

that section 365(d)(4) protects only a lessor of property in which a person does not dwell or reside.[11] It does not protect a landlord of a sublet apartment merely because the lessee/sublessor derives income therefrom.

■ While "there generally is no need for a court to inquire beyond the plain language of the statute," *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240–41, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989), there is room for a court to review the legislative history to ascertain Congress' intent and thereby avoid a mechanistic result unintended by Congress, *see Kelly v. Robinson*, 479 U.S. 36, 49, 107 S.Ct. 353, 361, 93 L.Ed.2d 216 (1986) (statutes should not be read " 'with the ease of a computer' ") (*quoting Bank of Marin v. England*, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966)). *See generally* 2A N. Singer, *Statutes and Statutory Construction* § 46.07 (4th ed.1984) ("it is clear that if the literal import of the text of an act is inconsistent with the legislative meaning or intent, or such interpretation leads to absurd results, the words of the statute will be modified to agree with the intention of the legislature") (citations

omitted). *Accord United Savings Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988) ("Statutory construction, however, is a holistic endeavor. A position that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme ... because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law") (citations omitted). In this instance, the legislative history and structure of section 365 underscore the language of section 365(d)(4) rather than contradict it.

The 1984 amendments to section 365 were prompted by Congressional concern for lessors and other tenants in shopping centers.[12] Although the language of section 365(d)(4) is not restricted to shopping centers and applies to every unexpired lease of nonresidential real property, the legislative history, cited above at II–A, shows quite clearly that Congress was concerned with pure business environments and the harm from long-term indecision concerning a store. In drafting broader language, Congress hoped to ameliorate

---

**11.** Such a parsing of section 365(d)(4) raises concerns of "over-literalism." *See Cummings v. Board of Education*, 275 A.D. 577, 90 N.Y.S.2d 564, 573 (1st Dep't), *aff'd*, 300 N.Y. 611, 90 N.E.2d 67 (1949) (" 'it is always an unsafe way of construing a statute ... to divide it, by a process of etymological dissection, and to separate words, and then apply to each, thus separated from its context, some particular definition given by lexicographers, and then reconstruct the instrument on the basis of these definitions' ") (*quoting International Trust Co. v. American Loan & Trust Co.*, 62 Minn. 501, 503, 65 N.W. 78, 79 (1895)); 2A N. Singer, *Statutes and Statutory Construction* § 46.07 (4th ed. 1984) (discussing the limits of literalism). Over-literalism occurs where the literal reading of the text of a statute suggests an interpretation at odds with the purpose of the legislature in enacting it. Courts are to follow the express purpose of Congress rather than slavishly follow the words of the statute. *See Federal Deposit Ins. Corp. v. Tremaine*, 133 F.2d 827, 830 (2d Cir.1943) (L. Hand, J.) ("There is no surer guide in the interpretation of a statute than its purpose when that is sufficiently disclosed; nor any surer mark of over solicitude for the letter than to wince at carrying out that purpose because the words used do not formally quite match

with it"). It is not clear here, however, that Congress intended any purpose other than that stated by Senator Hatch. *See* supra Part II–A. A literal reading of section 365(d)(4) is consistent with Senator Hatch's comments and, therefore, does not raise the above concerns.

**12.** One court has gone to the other extreme of over solicitude for the legislative history in finding that the purpose of section 365(d)(4) was to protect only other tenants and not the lessor:

[S]ection 365(d)(4) should be construed in accordance with its purpose. That purpose is not to give an advantage to lessors ... over other creditors. *See In re PCH Associates*, 804 F.2d 193 (2d Cir.1986). Rather, that purpose is to protect others from the disadvantage of a commercial vacuum resulting from prolonged delay of the trustee in deciding to assume or reject the lease.

*Baker v. Harris Pine Mills (In re Harris Pine Mills)*, 79 B.R. 919, 923 (D.Ore.1987), *aff'd*, 862 F.2d 217, 18 Bankr.Ct.Dec. (CRR) 947, Bankr.L. Rev. (CCH) ¶ 72,502 (9th Cir.1988). This position is not generally accepted. *See In re Wedtech Corp.*, 72 B.R. 464, 469, 17 Collier Bankr. Cas.2d (MB) 17, 15 Bankr.Ct.Dec. (CRR) 1346, Bankr.L.Rep. (CCH) ¶ 71,782 (Bankr.S.D.N.Y. 1987).

the detriment to landlords of other "nonresidential *structures*" from a debtor's unjustified failure promptly to assume or reject a lease pertaining to premises similar to a store in its commercial nature. *See* 130 Cong.Rec.S. 8894–95 (daily ed. June 29, 1984) (statements of Sen. Hatch) (emphasis added). Highlighted by Senator Hatch's use of the term "structures", and not the term "leases" which is noteworthily absent in his comments, the legislative history is consistent with the express terminology of the section and indicates that Congress, when it legislated with respect to nonresidential property, was focusing on the commercial nature of the property. In sum, nowhere in the legislative history is there any evidence that Congress intended section 365(d)(4) to apply to residential structures, such as apartment buildings.

■ In view of the language of the statute and the legislative history, we conclude that the Leases are residential and fall outside the scope of section 365(d)(4). There is no dispute that the Apartments in question are residential: they provide homes for human beings. That being so, the Leases are not automatically rejected as a matter of law.[13]

We reach this conclusion reluctantly. The result is somewhat troublesome. The lease of apartment 23–F serves solely a commercial purpose for the Debtor.[14] Second Lippman Aff. at ¶ 5. The Debtor is a sophisticated businessman who leased that apartment intending to sublet it at a profit, hoping to eventually sell his interest and realize a substantial appreciation in value. The relationship between the Movant and

the Debtor vis-a-vis apartment 23–F was purely commercial; namely, both parties entered into the lease agreement solely out of economic motives and the fact that the property would provide shelter for someone was purely ancillary. Viewed in this light, the line between the lease for apartment 23–F and commercial property becomes blurred. The only difference is happenstance: the underlying property here has people residing on it whereas the typical nonresidential lease involves a business enterprise using the property for a commercial purpose. Indeed, had the subtenant set up an art gallery instead of residence in apartment 23–F, that lease would have fallen within section 365(d)(4), been terminated by operation of law after 60 days, and the property surrendered to the Movant.

This problem is also illustrated by the case of parties to a ground lease where the lessor owns the underlying land and the lessee owns the physical structure on the land and leases the land from the landlord. The ground lease is certainly a purely commercial transaction between the parties and yet it is unclear whether the ground lease would be subject to automatic rejection under section 365(d)(4).[15] In this scenario, the inquiry into whether people reside in the building makes less intuitive sense, although its mandated by the statute.

It is equally apparent, however, that Congress wished to minimize the disruption caused by eviction of non-debtor tenants. This solicitude is seen most prominently in section 365(h)[16] where Congress authorized

---

**13.** This holding is not meant to indicate that a motion to compel assumption or rejection according to the judicial standards developed under section 365(d)(2), *see Theatre Holding Co. v. Mauro,* 681 F.2d 102, 9 Bankr.Ct.Dec. (CRR) 263, Bankr.L.Rep. (CCH) ¶ 68,712 (2nd Cir. 1982), would be inappropriate.

**14.** There is some dispute as to whether there was a commercial motivation behind the original acquisition of apartments 14–E and 15–H. Although he now resides in apartment 14–E, Lippman originally resided in apartment 15–H and apartment 14–E was occupied by the Steinschribers, Lippman's co-owners. Second Lippman Aff. ¶¶ 5, 6. For purposes of our holding, these facts are irrelevant.

**15.** For a case where the sublessees lost their homes because of automatic rejection of the original ground lease, *see Condominium Admin. Serv., Inc.,* 55 B.R. at 795 (sublessees lose residences in a mobile home park when the ground lease between the land owner and lessee/sublessor was automatically rejected and the property immediately surrendered pursuant to section 365(d)(4).

**16.** Section 365(h) provides in pertinent part:

If the trustee rejects an unexpired lease of real property of the debtor under which the debtor is a lessor ..., the lessee ... may treat such lease ... as terminated by rejection ...; or, in the alternative, the lessee ... may remain in

non-debtor tenants to remain in possession of property under a lease, notwithstanding rejection of the lease by the debtor/lessor, and exercise any setoffs they may have against the rent reserve as a result of the debtor/lessor's failure to perform obligations under the lease. Even that concern may be unrealized in the situation before us because the Debtor is both lessor and lessee. While the Debtor's rejection of the sublease with Mr. Douglas for apartment 23–F would not require Mr. Douglas to leave the premises, a rejection of the ground lease between the Debtor and the Movant would have the practical effect of evicting the subtenant. Such a situation may work unique hardship upon the building owner and residents by depriving both of protections found in the Code: 1) the landlord may be deprived of protection under section 365(d)(4) simply on the ground that subtenants use the property as their residence despite the fact that the original lease was wholly commercial; and 2) the subtenant may lose the protection of section 365(h) if the ground lease between the landlord and lessee/sublessor is rejected and the property subject to immediate surrender under section 364(d)(4).

The legislative history for these sections manifests no real recognition of the problem before us. A solution to the quandary resulting from such fact patterns, however, cannot come from the courts in light of the language employed in section 365(d)(4) and its legislative history; the solution must come from Congress. One possible solution providing both landlords and subtenants with greater certainty would be to amend section 365(d)(4) making it applicable to cases where residences are held by a debtor, as a sublessor, solely for investment purposes and also provide that section 365(h) clearly applies to the same situation thereby prohibiting the landlord from evicting the subtenant until legally entitled to do so under the sublease.

For the foregoing reasons, the Movant's motion to deem the Leases automatically

possession of the leasehold ... under any lease ... the term of which has commenced for the balance of such term and for any renewal or extension of such term that is

rejected as a matter of law pursuant to section 365(d)(4) is denied without prejudice to moving to compel assumption or rejection under section 365(d)(2). The parties are directed to schedule an evidentiary hearing on the Movant's request to lift the stay for cause under section 362(d)(1). It is

SO ORDERED.

enforceable by such lessee ... under applicable nonbankruptcy law.
11 U.S.C.A. § 365(h)(1) (1990).