**In re MORNINGSTAR ENTERPRISES, INC. t/a Mongolian Pavilion, Debtor.**

**Bankruptcy No. 91–10129S.**

United States Bankruptcy Court, E.D. Pennsylvania.

April 4, 1991.

Paul Swerdlow, Media, Pa., for debtor.

James J. O'Connell, Ass't. U.S. Trustee, Philadelphia, Pa.

Michael L. Temin, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, Pa., for movant.

**MEMORANDUM**

DAVID A. SCHOLL, Bankruptcy Judge.

On March 14, 1991, 200 Walnut Associates, the landlord of the premises occupied by the Debtor-restaurant ("the Landlord"), filed a Motion ("the Motion") seeking "immediate relief" from the automatic stay and, alternatively, that the Debtor, MORNINGSTAR ENTERPRISES, INC. ("the Debtor), be compelled to "immediately surrender" the premises of the Landlord from which the Debtor was conducting its business at 212 Walnut Street, 2nd Floor, Philadelphia, Pennsylvania 19106 ("the Premises"). The Motion alleged that parties' lease for the Premises, dated June 30, 1989, and extending for eight years with a five-year renewal option, must be deemed rejected in light of the failure of the Debtor to file a motion to assume or reject the lease or to extend the time for assuming or rejecting it within the 60–day period after the filing of this voluntary Chapter 11 case on January 7, 1991, established by 11 U.S.C. § 365(d)(4). An expedited hearing was requested because the Debtor (1) was allegedly conducting a well-attended dance club in the Premises despite a lease provision restricting the use of the Premises to an Oriental restaurant, (2) had allegedly allowed its requisite insurance coverage to lapse, and (3) had allegedly breached its requirement to repair the Premises by allowing it to become flooded.

The request for an expedited hearing was granted and the hearing on the Motion was conducted on March 26, 1991. Testimony from the Landlord's in-house counsel and the manager of the theaters owned by an entity related to the Landlord was received on its behalf, and the Debtor's two principals testified on its own behalf.

■ Based upon this testimony, we find that, when this case began, the parties' relationship was amicable. At the meeting of creditors, pursuant to 11 U.S.C. § 341(a), on February 12, 1991, the Debtor's principals discussed their business plan with the Landlord's representatives, which included a request for a 90–day moratorium on rent while the Debtor attempted to finalize an

arrangement for a cash infusion from one or more prospective investors. The Landlord replied that it would consider this proposal and, while not assenting to it, took no action and possibly would have taken no action to evict the Debtor had the Debtor not decided to convert its facilities into "Club Hardcore" on the evenings/mornings of February 23/24, March 2/3, and March 8/9, 1991. The first two events were advertised as dances, conducted between 10:00 P.M. and 5:00 A.M., and the second event resulted in considerable noise and anti-social behavior by prospective customers. The last event featured the "1st Anniversary" of a rap party, featuring a nationally-famous rap group, RUN–DMC. Thereafter, the City prohibited further dance events at the Premises unless the Debtor obtained a license to do so. While they proceeded to apply for a license, the Debtor's principals indicated no interest in continuing similar dance events, as opposed to small, private parties, at the Premises in the future.

The Debtor's principals conceded that, although the rent under the Lease was in excess of $11,000 monthly, the Debtor had remitted only $1,000 towards rent to the Landlord since the bankruptcy filing, apparently depending upon the Landlord's acquiescence with the proposed 90–day rent moratorium. On its part, the Landlord, on January 23, 1991, without having obtained relief from the automatic stay, unilaterally "applied" $22,682.79 of the Debtor's $27,-084.00 security deposit to a pre-petition rent balance, leaving an alleged balance of unpaid pre-petition rent of about $8,000.

The Debtor's principals identified three potential investors in the business, whose interest was allegedly generated by the unique Oriental food-preparation process utilized by the Debtor in its restaurant. However, admittedly, none of these investors had made any firm commitments nor placed any financial commitments into writing. The Debtor's principals candidly conceded that, since about half of the proposed 90–day moratorium period had already passed, there was a substantial possibility that the entire period would lapse without

a commitment from any investor, and they would be compelled to close the restaurant.

We are prepared to accept the Debtor's contentions that it in fact obtained adequate alternative insurance protection upon the termination of its prior policy; that the "flooding" was a minor plumbing problem which was duly repaired; and that it will cease scheduling any more public dance events at the premises. The Debtor claimed that it scheduled these dance events on the erroneous belief that the lease permitted such events because its predecessors at the Premises conducted musical and dance events there, and because it was committed for the three events which occurred before it realized its error. However, we cannot restore the good will of the Debtor with the Landlord. The Landlord's willingness to work with the Debtor has apparently been lost, mostly as a result of the scheduling of the dance events.

■ The Landlord's initial passive acquiescence in the Debtor's proposed Plan undoubtedly was a factor in the Debtor's failing to file a motion to assume or reject the lease or extend the time for doing so, pursuant to 11 U.S.C. § 365(d)(4), within the first 60 days after the entry of the order for relief. However, the failure to do so rendered the Debtor susceptible to the " 'substantial trap for the unwary' " arising from the harsh literal wording of § 365(d)(4). *In re Car–Gill, Inc.*, 125 B.R. 133, 139 (Bankr.E.D.Pa.1991), quoting 2 COLLIER ON BANKRUPTCY, ¶ 365.03[3], at 365–32 n. 28b (15th ed. 1990).

We held, in *Car–Gill*, that a landlord may, by certain courses of conduct, effect a waiver of its rights under § 365(d)(4), or, alternatively, be estopped from asserting such rights. However, the instant facts present neither acceptance of rents; the Landlord's affirmative communication of a willingness to allow a debtor to remain as a tenant to the debtor and to the court; or actions which caused the debtor to invest in improvements to the premises, the coalescence of which we found constituted both a waiver and estoppel on behalf of the landlord in *Car–Gill*. In fact, there was admit-

tedly no affirmative commitment of the Landlord to the assumption of the instant lease. Therefore, neither waiver nor estoppel can be successfully invoked against the Landlord by the instant Debtor.

The Debtor attempted to analogize the facts of this case to those of *In re Boston Business Machines, Inc.*, 87 B.R. 867 (Bankr.E.D.Pa.1988). In that case, we refused to disregard the 60–day deadline provided in § 365(d)(4) despite the fact that it was innocently overlooked by the debtor and its counsel, *id.* at 872–73, reasoning of doubtless little comfort to the Debtor. However, in *Boston Business Machines,* the debtor had filed a motion under 11 U.S.C. § 362(h) against the landlord, and we found a serious violation of the automatic stay on the part of the landlord, justifying substantial damages, which we indicated that we would commute if and only if the landlord allowed the debtor to belatedly assume the lease. Not surprisingly, that landlord ultimately allowed that debtor to assume the parties' lease.

Here, the Landlord appears to have violated the automatic stay, *see* 11 U.S.C. §§ 362(a)(3), (a)(7), by unilaterally setting off part of the Debtor's security deposit against pre-petition rent arrearages. However, since the Landlord had a "special interest" similar to, if not the equivalent of, a security interest in the escrow deposit funds, *see Brooks Shoe Mfg. Co. v. United Telephone Co.*, 39 B.R. 980, 983–84 (E.D. Pa.1984); and *In re Shapiro, Official Committee of Unsecured Creditors v. Cushman & Wakefield of Penna., Inc.*, 124 B.R. 974, 982–83 (Bankr.E.D.Pa.1991), its conduct in seizing part of the deposit was a far cry from the conduct of the landlord in *Boston Business Machines*, 87 B.R. at 869–70, who had succeeded in having the debtor-tenant physically evicted from his place of business without first having obtained relief from the stay. Despite our sympathy for the Debtor's plight, we cannot, in good conscience, apply the same level of pressure to the instant Landlord to "do equity" to the debtor-tenant as we did to the landlord in *Boston Business Machines.*

We therefore find ourselves unable to allow the Debtor to extricate itself from the consequences of the rejection of the Lease by operation of law which is commanded by § 365(d)(4) as easily as the *Boston Business Machines* debtor. The only respites which we can provide to the Debtor or to soften the harshness of the result of granting relief from the automatic stay to the Landlord and allowing the Landlord to proceed with the Debtor's imminent eviction are an allowance of at least a reasonable time to the Debtor to get its affairs in order by staying its eviction for about 25 days and indicating our receptivity to a motion to reconsider the effect of our order if the Debtor is able to cure all rental defaults, provide adequate security of future performance according to the Lease, and waive any § 362(h) claims against the Landlord.

There is a split of authority regarding the effect of a debtor-tenant's failure to adhere to the dictates of 11 U.S.C. § 365(d)(4), as reflected by the alternative relief sought by the Landlord in its motion. One line of authority, espoused by this court in *Boston Business Machines*, 87 B.R. at 871; and *In re Adams*, 65 B.R. 646, 647–49 (Bankr.E.D.Pa.1986), holds that, even if a lease is rejected by force of § 365(d)(4), the landlord is merely entitled to relief from the automatic stay to enforce its rights against the debtor-tenant under applicable state law. *Accord, In re Cybernetic Services, Inc.*, 94 B.R. 951, 954 (Bankr.W.D.Mich.1989); *In re Aneiro*, 72 B.R. 424, 429 (Bankr.S.D.Cal.1987); *In re Re–Trac Corp.*, 59 B.R. 251, 258 (Bankr.D. Minn.1986); and *In re Storage Technology Corp.*, 53 B.R. 471, 475 (Bankr.D.Colo. 1985). *Cf. In re Mead*, 28 B.R. 1000, 1001, 1002 & n. 2 (E.D.Pa.1983).

The other line of authority, represented by a reversal of an Order of this court following the *Adams* holding in *In re U.S. Fax, Inc.*, 114 B.R. 70, 71–73 (E.D.Pa.1990), maintains that § 365(d)(4) dictates that no relief from the stay is needed, and that the landlord can immediately force the debtor-tenant from the premises, apparently irrespective of the rights of the tenant to continued possession under state law, by order

of a bankruptcy court. *Accord, In re Chris–Kay Foods East, Inc.,* 118 B.R. 70, 72 (Bankr.E.D.Mich.1990); *In re Damiano-poulos,* 93 B.R. 3, 8 (Bankr.N.D.N.Y.1988); *In re Giles Associates, Ltd.,* 92 B.R. 695, 697–98 (Bankr.W.D.Tex.1988); and *In re Hurst Lincoln–Mercury, Inc.,* 70 B.R. 815, 817 (Bankr.S.D.Ohio 1987).

While we recognize that the decision of the district court in *U.S. Fax* is entitled to a considerable degree of deference,[1] we have difficulty applying its holding in certain factual settings. If the debtor-tenant has paid all of the rent due, and has not otherwise violated the lease terms, it seems irrational to award the landlord possession merely because the debtor's counsel overlooked the significance of § 365(d)(4). Moreover, even if there is a pre-petition rent-payment default, if an eviction is based solely upon non-payment of rent, a Pennsylvania tenant is normally able to retain possession by curing the default at any time prior to the consummation of execution upon a judgment for possession. *See In re C & C TV & Appliance, Inc.,* 97 B.R. 782, 787 & n. 1 (Bankr.E.D.Pa.), *aff'd,* 103 B.R. 590 (E.D.Pa.1989); and *In re De-Santis,* 66 B.R. 998, 1002–03 (Bankr.E.D. Pa.1986). It appears inequitable to conclude that a debtor loses these state-law rights merely because he files bankruptcy and fails to file a § 365(d)(4) motion.

As we interpreted § 365(d)(4) in *Boston Business Machines* and *Adams,* the "immediate surrender" effected is only that of the debtor-tenant's right to invoke § 362(a) to forestall eviction processes in the state court. Pursuant to the holdings of these cases, the debtor-tenant, though relegated to the state court for resolution of its rights to possession, would still be entitled to muster whatever state-law defenses it could in that forum.

Another consideration is the summary and potentially-disorderly nature of the eviction process effected in an *"immediate surrender."* This was not an issue in *U.S. Fax,* where the tenant voluntarily departed from the premises before state court process was needed. However, the instant Debtor is in possession of the Premises, and the process of involuntary dispossession may become an issue. Many courts adopting the stance of *U.S. Fax* have usually allowed debtors in possession of a premises to have a brief respite before a "bankruptcy court eviction" may be accomplished (via the marshal?). *See Damiano-poulos, supra,* 93 B.R. at 8 (30–day grace period allowed); *In re Fosko Markets, Inc.,* 74 B.R. 384, 392 (Bankr.S.D.N.Y.1987) (17 days grace period allowed); and *Hurst, supra,* 70 B.R. at 818 (two weeks grace period allowed).

In light of the foregoing, we will enter an Order giving the Landlord immediate relief from the automatic stay, but requiring it to forebear from physically evicting the Debtor for about 25 days, *i.e.,* until after April 30, 1991. We will also specifically provide that we will reconsider that aspect of the Order terminating the Debtor's possessory rights as of April 30, 1991, if and only if (1) the Debtor is able to immediately cure all pre-petition and post-petition rent delinquencies (presumably possible only if a firm investor materializes); (2) the Debtor allows the landlord to set off the security deposit already seized with impunity from 11 U.S.C. § 362(h); and (3) the Debtor promptly files a motion to assume the lease under 11 U.S.C. § 365(b)(1). We must further note that a § 365(b)(1) motion is unlikely to be granted unless the Debtor replenishes the security deposit, cures any non-monetary defaults by obtaining adequate insurance and making repairs, and refrains from utilizing the premises for any purposes prohibited by the lease, notably by making good its prom-

---

1. We note, however, that a decision of a single district judge in a multi-judge district is not the "law of the district," *see Threadgill v. Armstrong World Industries, Inc.,* 928 F.2d 1366, 1371–72 (3d Cir.1991), and therefore we are not bound to follow a decision of a single district court judge. *See In re Gaylor,* 123 B.R. 236, 241–43 (Bankr.E.D.Mich.1991). This is particularly so when a decision of another judge in the same district, *e.g., Mead, supra,* points in the opposite direction. *Cf. In re Windsor Communications Group, Inc.,* 67 B.R. 692, 698–99 (Bankr.E.D.Pa. 1986).

ise not to conduct any further dance events in the Premises.

An Order consistent with the conclusions reached herein will be entered.