**In re HISTORICAL LOCUST STREET DEVELOPMENT ASSOCIATES, Debtor.**

**Bankruptcy No. 99–17518DAS.**

United States Bankruptcy Court, E.D. Pennsylvania, Philadelphia Division.

March 16, 2000.

James M. Matour, Middleman & Matour, Philadelphia, PA, for debtor.

Robert Kargen, White & Williams LLP, Philadelphia, PA, for DJW Trust.

Nick Emper, Media, PA, for petitioners.

Aris J. Karalis, Ciardi, Maschmeyer & Karalis, P.C., Philadelphia, PA, for Greek Orthodox Cathedral of St. George and 246–48 So. 8th Street Inc.

Cynthia White Winters, Chief Deputy City Solicitor, Tax Enforcement Unit, Philadelphia, PA, for City of Philadelphia.

Frederic Baker, Ass't U.S. Trustee, Philadelphia, PA, United States Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Before us in the above-captioned Chapter 11 case is a motion ("the Motion") of 246–248 S. 8th Street Inc. ("the Movant") to Compel Payment of Administrative Rent, Turnover of Real Property and for Relief from the Automatic Stay. The Motion seeks to invoke 11 U.S.C. § 365(d)(4), which gives landlords special rights as to "an unexpired lease of nonresidential real property," as to an unusual document entitled "Lease Agreement" ("the Agreement") by which HISTORICAL LOCUST STREET DEVELOPMENT ASSOCIATES ("the Debtor") obtained the use of

an adjacent parking lot ("the Lot") for the mostly residential tenants in its apartment building.

Although we find that the Agreement is more like a "lease" than (as the Debtor argues) a "license," we also find that the Agreement does not fit within the narrow category of contracts controlled by § 365(d)(4) (or 11 U.S.C. § 365(d)(3)). Therefore, the Motion is denied.

## B. PROCEDURAL AND FACTUAL HISTORY

On June 10, 1999, an involuntary bankruptcy petition under Chapter 11 of the Bankruptcy Code was filed against the Debtor by Dresden Management Co., Dresden Maintenance Co., and H.H.L.P. ("the Petitioners"). At a status hearing of September 8, 1999, it became apparent that the involuntary filing was a "friendly" one, and an Order for relief was consensually entered on that date. Per this court's direction at a September 22, 1999, status hearing, a Joint Chapter 11 Plan of Reorganization ("the Plan") and accompanying Disclosure Statement ("D/S") was filed by the Debtor and a "friendly" secured creditor, the DJW Trust ("the Trust"), on December 30, 1999.

On January 19, 2000, the Greek Orthodox Cathedral of St. George ("the Cathedral"), located adjacent to the side of the Lot across from that abutting the Property, and its related entity, the Movant (collectively "the Objectors"), filed Objections to the D/S. After three re-drafts of the D/S to meet repeated objections of the Objectors, it appears that the D/S will finally be approved after a further submission on March 20, 2000. We are hopeful for an early May, 2000, confirmation hearing.

On January 21, 2000, the Movant filed the instant Motion. The Court held a hearing on the Motion on February 16, 2000. At the close of the hearing both parties were allowed to submit opening briefs by February 25, 2000, and reply briefs by March 3, 2000. Both submitted their briefs in a timely fashion.

Robert G. Welch is the general partner of the Debtor. The Debtor owns and operates real property at 238–44 South 8th Street, Philadelphia, PA, containing (16) residential units and four (4) commercial units ("the Property"). Welch is also the owner of the Petitioners. The Trust was formed by Welch with his wife, Donna Jean Welsh (the Trust's name is her initials), and the couple's children are its beneficiaries. DJW was apparently formed to purchase, on or about October 27, 1993, for the amount of $625,000, a first mortgage recorded against the Property held by Nassau Savings & Loan Association of Princeton, New Jersey ("Nassau"), prior to its liquidation by the Resolution Trust Corporation.

The Movant was formed by the Cathedral to own a parking lot between the Cathedral and the Debtor's Property which is jointly used by both pursuant to the terms of the Agreement in issue. By way of history, on October 1, 1986, the St. George Land Acquisition Corporation ("the Seller"), then another wholly-owned corporation of the Cathedral, which then owned both the Property and the Lot, along with Welch, the Movant, and Nassau, entered into an Agreement of Sale for Real Estate ("the Purchase Agreement"). The global agreement among these parties, apparently motivated by Nassau's threats to foreclose against the Property and Lot, included the release of the Seller and the Cathedral from a $2 million liability to Nassau by the Debtor's assumption of this liability. Also, Welsh was to and perhaps did raise $1.8 million necessary to renovate the Property.

Under the terms of the Purchase Agreement the Seller conveyed the title of the Property to the Debtor and the title of the parking lot to the Movant. Pursuant thereto the Debtor entered into the Agreement at issue with the Movant. The Agreement has been recorded.

Under the Agreement, the Movant "leased" to the debtor designated parking

spaces at the Lot for uses and time periods as follows:

1. ... (a) Four (4) designated 6–day per week (Monday through Saturday) spaces available from 6 A.M. to 6 P.M.

(b) Twelve (12) designated 7–day per week spaces usable 24 hours per day. These spaces may be relocated in bulk by Lessor on 90 day advance notice in writing to Lessee, to spaces selected by the Lessor within a two block radius, at no cost to Lessee, at substantially equivalent security.

(c) Lessee shall allocate said sixteen spaces among the actual tenants of the 20 units comprising of 238–244 S. 8th Street, Phila., PA, and shall notify Lessor in writing of such allocations, beyond that, said 16 spaces shall not be assigned or sublet to any party.

(d) Two of the spaces on said lot shall be designated for the use of Lessor 7 days per week.

. . .

The term of the Agreement was fifty (50) years, commencing December 1, 1986. The Debtor was given the option to renew the Agreement for an additional term of twenty-five (25) years, at a rental "equal to the fair market value of monthly parking spaces in the immediate area."

Pursuant to paragraph 3 of the Agreement, the Debtor was to pay, as consideration, a first $100,000 in two equal installments to the Cathedral, and this amount was paid by the Debtor. The Debtor was also obligated to pay the Cathedral an additional $100,000 on or before January 1, 1994, which, apparently for tax purposes, was characterized, at Welsh's request, as an "unconditional gift and contribution to the Cathedral." This second $100,000 has never been paid.

Pursuant to paragraph 1(h) of the Agreement, the debtor was also obligated to pay, as incurred by the Movant, eighty-five percent (85%) of the real estate taxes, liability insurance coverage, cost of maintenance, and other costs incident to the Lot.

These amounts were also unpaid, and the Movant, on August 31, 1992, and November 12, 1996, respectively, obtained judgments against the Debtor in the respective amounts of $13,547.58 for the years 1987 through 1992; and $9,552.51 for the years 1993 through 1996. As of October 13, 1999, the Movant claims that the total amount due to it from the Debtor is $170,-938.70.

With respect to remedies for breach, the Agreement further provides, at paragraph 3, that "Lessor may sue for monies, but cannot cancel the Lease, except for the initial partnership or any modification thereof." Thereafter, the Agreement, at paragraph 8, provides as follows:

It is hereby covenanted and agreed that any law, usage, or custom to the contrary notwithstanding, Lessor shall have the right at all times to enforce the covenants and provisions of this lease in strict accordance with the terms notwithstanding any conduct or custom on the part of the Lessor in refraining from so doing at any time or times to enforce its rights under said covenants and provisions strictly in accordance with the same shall not be construed as having created a custom in any way or manner contrary to the specific terms, provisions and covenants of this lease or as having in any way or manner modified the same. *However, the Lessor may not terminate this lease* (emphasis added).

Welch, an attorney, testified that he added the noncancellation and non-termination provisions referenced in the foregoing paragraph to assure that the Lot would be available to residents of the Property in an area where parking space is very scarce. Anthony Beldecos, a member of the Cathedral and one of the attorneys who the negotiated of the Agreement on the Movant's behalf, testified that he understood the foregoing provisions to merely require the Movant to commence a legal action for possession before it could eliminate the Debtor's possessing interest in the Lot. We note, however, that in the

Movant's pursuit of litigation against the Debtor over the past decade, possession of the Lot was never sought. It appears that preservation of the Lot and resolution of certain tax disputes with the City were the motivating factors in this bankruptcy filing.

## C. DISCUSSION

■ The thrust of the Motion is an attempt of the Movant to assert against the Debtor the rights provided in 11 U.S.C. §§ 365(d)(3) and (d)(4) of the Code, which provide in pertinent part as follows:

(3) The trustee [or debtor-in-possession ("DIP"), like the Debtor] shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60-day period.

(4) Notwithstanding paragraphs (1) and (2) [the latter of which ordinarily allows a DIP until confirmation to assume or reject an executory contract or unexpired lease] in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

The Debtor has not moved to assume or reject the Agreement, nor to extend the time for it to do so. Therefore, the Debtor's interest in the Lot may become a victim of the " ' "substantial trap for the unwary," ' " *In re Morningstar Enterprises, Inc.,* 128 B.R. 102, 104 (Bankr.E.D.Pa. 1991), quoting *In re Car–Gill, Inc.,* 125 B.R. 133, 139 (Bankr.E.D.Pa.1991), quoting in turn 2 COLLIER ON BANKRUPTCY, ¶ 365.03[3], at 365–32 n. 28b (15th ed.1990), which is § 365(d)(4). It may also become immediately liable for all post-petition obligations under the agreement under § 365(d)(3), although the Movant pegs this figure at the rather modest sum of $1871.30 at present, noting that it will increase as time goes by.

The Debtor's principal defense is that the Agreement is not a "lease," but is instead a "license." Its secondary line of defense is that, if the Agreement is a "lease," it is not a "lease of nonresidential real property" because it is uniquely tied to the interests of the numerous residential tenants in the Property. A final line of defense, if all else fails, is that, on authority of *Morningstar, supra,* 128 B.R. at 105–06, the last sentence of § 365(d)(4) should not be interpreted to wipe out the Debtor's state-law rights in the Lot, including, so it claims, the Agreement's provisions which preclude its cancellation or termination of its interest, and those of its residential tenants.

On balance, we conclude that the highly unusual aspects of the Agreement render the rather narrowly-scoped provisions of §§ 365(d)(3) and (d)(4) inapplicable to it. We are less persuaded that these aspects of the Agreement render it a "nonlease" or a "license." The determination of exactly what the Agreement is, in and of itself, may be a relatively insignificant point, because the Agreement appears to undisputably be an executory contract, subject to § 365(d)(2), if it is not subject to §§ 365(d)(3) and (d)(4). *See also* § 365(m) ("any rental agreement to use real property" is a "lease of real property").

Perhaps unfortunately, in the briefing process both parties have expended most of their energies on the issue of whether the Agreement is a "lease" or a "license."

Nevertheless, the Debtor clearly raises the alternative of whether the Agreement is a "lease of nonresidential real property" as well, citing *In re Bonita Glen II,* 152 B.R. 751, 752–54 (Bankr.S.D.Cal.1993) (§ 365(d)(4) does not apply to an apartment building ground lease); *In re Lippman,* 122 B.R. 206, 209–13 (Bankr. S.D.N.Y.1990) (§ 365(d)(4) does not apply to three apartments which the individual debtor subletted); and *In re Care Givers, Inc.,* 113 B.R. 263, 266–68 (Bankr.N.D.Tex. 1989) (§ 365(d)(4) does not apply to a debtor's lease of real property for use as a nursing home). *See also In re Terrace Apartments, Ltd.,* 107 B.R. 382, 383–84 (Bankr.N.D.Ga.1989) (lease of property to debtor for re-letting to military and civilian personnel of military base held not subject to § 365(d)(4)); and *In re Independence Village, Inc.,* 52 B.R. 715, 720–22 (Bankr. E.D.Mich.1985) (lease of property by debtor for use as a life-care facility found not subject to § 365(d)(4)). *Apparently contra, In re Emory Properties, Ltd.,* 106 B.R. 318, 320–21 (Bankr.N.D.Ga.1989) (long-term lease for hotel is subject to § 365(d)(4)); and *In re Sonora Convalescent Hospital, Inc.,* 69 B.R. 134, 136 (Bankr.E.D.Cal.1986) (debtor's lease of property for use as a convalescent home is subject to § 365(d)(4)).

Although it promises to do so in its reply brief, the Movant never really addresses this issue in either of its two briefs. Instead, it focuses on (1) rebutting the Debtor's relatively weak argument that the Agreement is a "license," and (2) an unpersuasive attempt to argue that a literal interpretation of the provision of the Agreement barring its cancellation or termination is "absurd."

■ The reasoning of the § 365(d)(4) cases cited above which we believe is most pertinent to the instant controversery is well-expressed by the court in *Independence Village, supra,* 52 B.R. at 722, as follows:

The general rule in Chapter 11 (and Chapter 13) cases is that there is no 60–day deadline for the trustee or debtor in possession to assume or reject executory contracts and leases. The only exception in § 365 is for leases of nonresidential real property. In other words, it is § 365(d)(4) itself which is the exception. When the Code establishes both a rule and its exceptions, the exception should be construed narrowly....

*Accord, Care Givers, supra,* 113 B.R. at 267.

■ As the *Care Givers* court points out, § 365(d)(4) was a component of the 1984 Code amendments designed to protect owners of shopping centers from subjection to vacancies during the potentially lengthy period that debtor tenants of these centers delayed in deciding whether to assume or reject their store leases. 113 B.R. at 266. *Accord, Lippman, supra,* 122 B.R. at 211; and *Independence Village, supra,* 52 B.R. at 720–21. On the other hand, residential realty was not included in § 365(d)(4) because of a policy of protecting residents of real property, whether they be debtors or nondebtors. *See Care Givers, supra,* 113 B.R. at 267.

The arguably contrary decisions in *Sonora Convalescent Hospital* and *Emory Properties* provide little justification for their results. *Sonora Convalescent Hospital* seems to hold that the fact that the debtor is utilizing the leased property for commercial purposes as opposed to its own residence is significant. 69 B.R. at 136. *Emory Properties* goes off on the court's holding that hotel patrons do not generally reside in hotels in the same way that they do in their homes. 106 B.R. at 320–21. These decisions are therefore not very persuasive in the context of the instant facts, particularly *Emory Properties,* because this case does not implicate hotel patrons.

We are not overlooking the fact that the Agreement relates to the Lot and not to the Property itself, and that the tenants obviously reside in the former, not on the latter. However, the presence of the most

unique provision in this unusual Agreement—the prohibition on its cancellation and termination—convinces us that the rights of the Debtor's tenants to park in the Lot is so significant that it has become an important aspect of their respective residential tenancies. The protection of important rights of residents, although they are clearly not the Debtor, are thus at stake. On the other hand, the instant facts seem very far removed from the archetypical shopping center lease situation which §§ 365(d)(3) and (d)(4) were enacted to remedy.

We therefore hold that the Agreement does not constitute an "unexpired lease of nonresidential real property," within the scope of §§ 365(d)(3) and (d)(4). This decision renders it unnecessary to determine the more difficult of issue of ascertaining whether the agreement is a "lease" or something else, *e.g.*, a "license" or a disguised financing agreement of some sort. The Agreement clearly appears to be an executory contract which is within the scope of 11 U.S.C. § 365, whether it is a lease or not. On the other hand, the conclusion that the Agreement is not within the scope of §§ 365(d)(3) and (d)(4) completely undercuts the Motion.

■ We observe that it is only due to the Objectors' continuing critiques of the D/S that this case has not reached the stage of confirmation, when the Debtor would be obliged to assume or reject the Agreement pursuant to 11 U.S.C. § 365(d)(2). Due to the unusual payment terms of the Agreement, the post-petition delinquencies are minimal. There is hence no solid ground on which to exercise our discretion to grant the Movant relief from the automatic stay at this juncture. *See generally In re Fallon*, 244 B.R. 589, 592–93 (Bankr.E.D.Pa.2000). A more critical juncture may arrive when the Debtor must determine whether and on what terms it proposes to assume the Agreement. *See generally In re Whitsett*, 163 B.R. 752, 755–56 (Bankr.E.D.Pa.1994); and *In re*

*Gold Standard at Penn, Inc.*, 75 B.R. 669, 672–75 (Bankr.E.D.Pa.1987).

■ We will therefore only briefly discuss the issue of whether the Agreement is a "lease" or a "license." Under Pennsylvania law, a lease is "a conveyance or grant or demise of certain described land or tenement (usually in consideration of rent or other recompense) for a prescribed period ... but not less time than the lessor hath in the premises." *In re Pittsburgh Sports Associates Holding Co.*, 239 B.R. 75, 83 (Bankr.W.D.Pa.1999), quoting *Morrisville Shopping Center v. Sun Ray Drug Co.*, 381 Pa. 576, 582, 112 A.2d 183, 186 (1955).

The Movant argued that the Agreement is a lease because there was a conveyance of the spaces in the Lot for which there was a consideration of $200,000 and the other periodic costs and expenses. The Movant also noted that Nassau took out what it designated as a "Leasehold Mortgage" against the Agreement.

The Debtor argued that the Agreement is a license rather than a lease because it contains clauses permitting the relocation and substitution of parking spaces, and hence no "certain demised tenement" existed, *Pittsburgh Sports Associates, supra*, 239 B.R. at 83; that its very long term is atypical for leases; and that the terms of payment do not, like most leases, contemplate periodic payments.

■ However, the test for determining whether or not a contract is in fact a license emphasizes that the latter is "a purely personal privilege to live on the land or to do certain acts thereon, but not to exercise exclusive possession and enjoyment for a term specified in not a lease." *Sparrow v. Airport Parking Co. of America*, 221 Pa.Super. 32, 39, 289 A.2d 87, 91 (1972) (involves a parking lot at the Philadelphia International Airport). *See also Muzzio v. Steele*, 279 Pa. 226, 123 A. 776 (1924); and *Strickland v. Pennsylvania R.R.*, 154 Pa. 348, 26 A. 431 (1893).

A license is commonly defined as a mere permit or privilege to do what otherwise would be unlawful; it is generally revocable at the pleasure of the owner, and gives occupancy only so far as necessary to engage in the agreed acts of the performance of agreed services and no further. It is a privilege to occupy under the owner, and only insofar as the owner expressly allows ... "A lease, on the other hand, gives the right of possession of the property leased, and exclusive use or occupation of it for all purposes not prohibited by its terms," quoting *American Coin–Meter v. Poole,* 31 Colo.App. 316, 318[, 503 P.2d 626] (other citations omitted).

*In re Daben Corp.,* 469 F.Supp. 135, 142 (D.P.R.1979).

A license therefore provides a licensee with considerably less rights in real property than does a lease to a tenant. However, the instant Agreement provides that the Debtor is to receive a conveyance of the designated space for a period of time. The Debtor clearly anticipated and did receive quiet peaceable possession of the Lot's parking spaces and these spaces were under the exclusive control of the Debtor. For example, the Movant could not dictate to the Debtor how the spaces should be delegated or how much the Debtor could charge the ultimate users of the parking spaces. There were no limits on the Debtor's use of the parking spaces outside the specific limitations of the Agreement.

Moreover, once again we note that the most unique aspects of the Agreement are the provisions that it cannot be canceled or terminated by the Movant. We have already expressed our skepticism of the hypothesis of Beldecos that the Movant could nevertheless proceed to evict the Debtor through lawful means, and that these provisions were merely meant as a superassurance that the Debtor would be accorded due process were the Movant to seek such a remedy. Welch's testimony that these provisions had a special significance in preserving the Lot for the use of the Debtor's tenants was more persuasive. Beldecos' interpretation appears, moreover, inconsistent with the Movant's own past course of conduct in suing only for the Debtor's unpaid share of the Property's costs and expenses, but refraining from requesting a judgment for possession of the Lot. Such a course of action is unusual landlord behavior.

However, these provisions, far from relegating the Movant to the status of a mere licensee occupying the Lot at the pleasure of the owner, as in *Sparrow, supra,* elevate the Movant's status and promissory rights in the Property to that far superior to most tenants, let alone licensees. In light of this status, it is most difficult to characterize the Debtor as a mere licensee of the Lot.

Finally, we briefly observe that the guiding principle of our holding in *Morningstar Enterprises, supra,* 128 B.R. at 104–05, is that the last sentence of § 365(d)(4), requiring a DIP to "immediately surrender" a rejected nonresidential leasehold, should not wipe out state-law rights of the DIP in the leasehold. This observation has particular force in the context of the Agreement's containing anti-termination language, which it is doubtful that § 365(d)(4) would wipe out.

The foregoing observations reinforce our conclusion that the Agreement is a "rare bird" which cannot be caged (or effectively shot down) by § 365(d)(4). Accordingly, the Motion will be denied.

## D. CONCLUSION

An order reciting this conclusion will be entered.